IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIMITRIOS GRAMMENOS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALLSTATE INSURANCE CO., et al. | : | NO. 07-2725 |

## MEMORANDUM OF DECISION

THOMAS J. RUETER                                        April      , 2009
Chief United States Magistrate Judge

   Presently before this court is Defendant Allstate Insurance Company's ("Allstate")

Motion For Partial Summary Judgment (Doc. No. 43), requesting that the court grant judgment in

Allstate's favor on Count II of plaintiff's Complaint, alleging that Allstate acted in bad faith in

the handling of plaintiff's claim under Allstate's insurance policy, and plaintiff's response thereto

(Doc. No. 53.)  For the reasons stated below, the court will grant Allstate's motion for partial

summary judgment.

## I.   BACKGROUND

   On June 12, 2006, Allstate received a notice of claim from a public adjuster, third-

party defendant, Aclaim Adjustment Company, Inc. ("Aclaim").  Specifically, Aclaim reported to

Allstate that on June 10, 2006 at approximately 12:00 a.m., a water loss occurred at 2004 Bergen

Street, Philadelphia, Pennsylvania, a house plaintiff recently purchased on May 25, 2006.

   Allstate immediately investigated the claim.  During a statement made under oath,

plaintiff claimed that on June 9, 2006, he was at the newly purchased house and noticed a small

leak emanating from a pipe behind the second floor bath tub.  Plaintiff opened the access panel,

turned off the water and inspected the crack in the pipe.  Plaintiff, who operated an auto body

shop, stated that he left the home, and went to his body shop to retrieve tools to repair the leaky

pipe.  Plaintiff claims that he returned to the home and repaired the pipe by soldering it with a heated torch.  Plaintiff then turned on the water and left the house.  According to plaintiff, when he returned to the house the next day, June 10, 2006, there was massive flooding in the house, caused by the detachment of the same pipe he allegedly fixed the previous day.

During the course of its investigation, Allstate obtained a tape recorded interview of John Fickenscher of CPR Restoration & Cleaning Service.  Mr. Fickenscher stated, with certainty, that he was contacted on the night of June 9, 2006, by a man named Paul DeFinis, who was an agent of Aclaim.  Mr. DeFinis asked Mr. Fickenscher to come to plaintiff's house because there was extensive water damage and the house needed to be cleaned up.  Mr. Fickenscher came to the house on June 9, 2006 and met Mr. DeFinis and plaintiff.

The next day, June 10, 2006, Mr. Fickenscher returned to the house, at which time, plaintiff executed a contract with his company to remove water damaged items from the house.  On that same date, Mr. Fickenscher and his staff removed dry wall, carpets and other items that were damaged.  Allstate was never notified of the claim prior to the commencement of this work by Mr. Fickenscher.  Contrary to the testimony of Mr. Fickenscher, Mr. DeFinis testified that he visited plaintiff's home only once, on June 10, 2006, and says Mr. Fickenscher and plaintiff were there.  Mr. DeFinis says that he took several photographs of the damaged portions of the house with a disposable camera he purchased that day at a local Rite Aid Drug Store, as well as with a Polaroid camera he carried with him.  Eventually, Aclaim submitted estimates for repair to the home which appear to exceed the damage represented by the photographs taken by Mr. DeFinis on June 10, 2006 (according to Mr. DeFinis) or June 9, 2006 (according to Mr. Fickenscher).

2

In the course of the investigation, Allstate retained a master plumber, Alan Insogna, and two forensic engineers, Daniel Seeley and James Conroy, of the firm of Peter Vallas Associates, Inc.  All of these experts examined the pipes from which the water allegedly discharged.  In a June 28, 2006 report, Messrs. Seeley and Conroy reported the following:

> ... The separation and/or failure of the pipe reportedly occurred after the insured had attempted to repair a previous minor leaking condition.  The pipe reportedly failed after he left the property after the completion and/or repairing of the minor leak.
>
> Metallurgical evaluations of the pipe and tub diverter however indicate that the method used to re-solder and/or attempt to re-attach the piping or prevent additional leakage was improper and non-existent.  There was no evidence to indicate that any effort to re-solder the pipe to the tub diverter was performed.  The flow of the solder indicates that it was heated up to the point where it weakened the bond and solder was never re-applied.

See Allstate's Motion, Ex. F at 5.

On June 29, 2006, Master Plumber Alan Insogna reported the following:

> Per the insured's verbal statement, he had attempted to make a repair to the sweat connection using a map gas tank, solder, and a pair of pliers.  Typically, soldered joints will begin to weep, staining the copper piping, and progress over the long term eventually resulting in partial and then complete failure of the connection.  This type of deterioration was not present at the above mentioned sweat connection.  We also noted the ceramic tile wall and drywall backing board that housed the tub faucet, as a whole, was sound and in good condition with some minimal staining.

See Allstate's Motion, Ex. G at 1.

Mr. Insogna elaborated on his report in his deposition taken on February 3, 2009. He testified as follows:

> Q.    Have you ever had any discussions of any kind with anyone at Allstate that that pipe failed as a result of an intentional act?
>
> A.    The joint was manipulated, sir, with pliers.  To me, it would stand to reason that since I don't see any deterioration, the manipulation of the joint

> given there's marks on that pipe is what caused that joint to fail. That's
> my, that's my best estimation of what has happened. I don't see anything
> that a joint has failed and we have that weeping and what not on there, so I
> guess to answer your question, joints don't just fail. They fail for a reason.

<u>See</u> Allstate's Motion, Ex. H at 36, lines 10-23. Later in the deposition, he stated the following:

> Q.    Did you see any solder on the pipe that had been applied recently?
>
> A.    The joint looked clean to me, meaning I did not see any, any – are we
>       talking about the joint that had failed?
>
> Q.    Yes.
>
> A.    Okay, on the joint that had failed, I didn't see any, any new solder on it, I
>       couldn't, when people, when you resolder a joint, you will see some new
>       solder. This joint looked confined to its cup space, nothing more, nothing
>       less, so I didn't see what I could find, could say would be new solder there.
>
> Q.    Did you see any solder of any kind?
>
> A.    Yes, on both the female end, the cup end of the joint and the male end,
>       meaning on the copper itself.
>
> Q.    Do you recall what the condition of that solder was?
>
> A.    I would say typical. That would be the condition of it.
>
> Q.    Did it, did that solder look like it had been recently heated?
>
> A.    No, sir.

<u>Id.</u> at page 47, lines 18-25, 48, lines 1-17.

On December 11, 2006, Allstate's representative, Holly Kelly, sent a letter to the

insured denying coverage. In the letter, she explained as follows:

> Based on its investigation, Allstate denies coverage under the policy for this loss.
> The investigation conducted by Allstate has determined that the water damage,
> reported to have occurred June 10, 2006 to the property located at 2004 Bergen
> Street, Philadelphia, Pennsylvania is not covered under the terms, conditions and
> exclusions of the policy. The investigation has determined that there have been

4

material misrepresentations, including but not limited to loss facts such as date
and manner of loss and resulting damages.

See Allstate's Motion, Ex. K.

## II.        DISCUSSION

In Count II of plaintiff's Complaint, he alleges a claim of bad faith under

Pennsylvania law, 42 Pa. Cons. Stat. Ann. § 8371.  Allstate moves for summary judgment on the

ground that it did not engage in bad faith because it conducted a fair and timely investigation of

the claim and possessed a reasonable basis for denying it.

A bad faith claim is distinct from the underlying contractual insurance claim from

which the dispute arose.  Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 525 (3d Cir.

2004).  To prove his bad faith claim, plaintiff must prove by clear and convincing evidence that

(1) the insurer lacked a reasonable basis to deny benefits under the policy; and (2) the insurer

knew or recklessly disregarded its lack of a reasonable basis.  Klinger v. State Farm Mut. Auto.

Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997).

A judge of our court recently summarized Pennsylvania law on the standards a

court should employ, when reviewing a motion for summary judgment on a bad faith claim:

> Pennsylvania's Bad Faith Statute provides a cause of action when an insurer
> "act[s] in bad faith towards the insured."  42 Pa. Cons. Stat. Ann. § 8371.  In the
> insurance context, "bad faith" is defined as "any frivolous or unfounded refusal to
> pay proceeds of a policy."  Terletsky v. Prudential Prop. & Cas. Ins. Co., 437 Pa.
> Super. 108, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law
> Dictionary 139 (6th ed. 1990)).  In order to prevail on a bad faith claim, an insured
> must show that the insurer did not have a reasonable basis for denying benefits
> under the policy and that the insurer knew of or recklessly disregarded its lack of
> reasonable basis in denying those benefits.  UPMC Health Sys. v. Metro. Life Ins.
> Co., 391 F.3d 497, 505 (3d Cir. 2004) (citing Terletsky, 437 Pa. Super. 108, 649
> A.2d 680).  To constitute bad faith for the failure to pay a claim, the insurer must
> have a dishonest purpose.  The NW. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121,

137 (3d Cir. 2005).  Although the refusal to pay need not be fraudulent, mere
negligence or bad judgment is insufficient.  Id.

The burden rests with the insured to show bad faith by clear and convincing
evidence.  Polselli v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 528 (3d Cir.
1977).  To satisfy this standard, the insured must present evidence "so clear,
direct, weighty and convincing as to enable a clear conviction, without hesitation,
about whether or not the defendants acted in bad faith." Bostick v. ITT Hartford
Group, Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999); Terletsky, 649 A.2d at 688
("[B]ad faith must be proven by clear and convincing evidence and not merely
insinuated.").  The clear and convincing standard raises the insured's burden in
opposing a summary judgment motion "because the court must view the evidence
presented in light of the substantive evidentiary burden at trial." Babayan, 430
F.3d at 137 (internal quotations omitted).  Furthermore, since the essence of a bad
faith claim is the denial of benefits without good reason, an insurer is entitled to
summary judgment if it can show a reasonable basis for its actions.  See Jung v.
Nationwide Mut. Fire Ins. Co., 949 F. Supp. 353, 360 (E.D. Pa. 1997); Quaciari v.
Allstate Ins. Co., 998 F. Supp. 578, 581 n.3 (E.D. Pa. 1998), aff'd, 172 F.3d 860
(3d Cir. 1998) (Table).

Bottke v. State Farm Fire and Cas. Co., 2009 WL 159703, at *4-5 (E.D. Pa. Jan. 22, 2009)

(Schiller, J.).

Applying the above standards to the undisputed facts of the case, the court finds

that no reasonable jury could find that Allstate acted in bad faith in denying plaintiff's claim for

coverage under the policy.  The Allstate policy provides that the policy does "not cover any loss

or occurrence in which any insured person has concealed or misrepresented any material facts or

circumstances." See Allstate's Motion, Ex. C at 5.

As described above, Allstate retained two independent experts who both

concluded that plaintiff had misrepresented the facts as to how the pipe became disconnected in

the bathroom, causing the water discharge.  Specifically, the report prepared by Peter Vallas

Associates, Inc., stated that "[t]here was no evidence to indicate that any effort to resolder the

pipe to the tub diverter was performed.  The flow of the solder indicates that it was heated up to

6

the point where it weakened the bond and solder was never reapplied."  <u>See</u> Allstate's Motion,
Ex. F at 5.  Furthermore, Alan Insogna saw no new solder that had been recently applied to the
pipe, as described by plaintiff.  Furthermore, Mr. Insogna said the pipe appeared to have been
"manipulated" by pliers.  He stated: "To me, it would stand to reason that since I don't see any
deterioration, the manipulation of the joint given these marks on that pipe is what caused that
joint to fail.  That's my, that's my best estimation of what has happened."  <u>See</u> Allstate's Motion,
Ex. G at 1; Ex. H at 36, lines 10-23.

        The two experts' opinions directly contradict the sworn statement of plaintiff, thus
providing strong evidence to Allstate that plaintiff made material misrepresentations as to the
cause of the discharge of the water, thus justifying the denial of the claim because of
misrepresentations.  Two other facts supported Allstate's denial of the claim.  First, John
Fickenscher, the operations manager of CPR Restoration and Cleaning Service, said with
certainty that the date of loss occurred on June 9, 2009, not June 10, 2009, as stated by plaintiff
and the third-party defendant, Aclaim.  Furthermore, the public adjuster did not notify Allstate of
the claim until June 12, 2006 after CPR Restoration and Cleaning Service removed walls and
carpets that were allegedly damaged by water, thus denying Allstate the opportunity to observe
first-hand the alleged damages.

        In sum, plaintiff has failed to show by clear and convincing evidence that Allstate
had no reasonable basis for denying plaintiff's claim.  There is also no clear and convincing
evidence that Allstate acted improperly in investigating plaintiff's claim.  To show that it acted in
good faith, "an insurance company simply must show it conducted a review or investigation
sufficiently thorough to yield a reasonable foundation for its action."  <u>Cantor v. The Equitable</u>

Life Assurance Society of the United States, 1999 WL 219786, at *3 (E.D. Pa. April 12, 1999). "The insurance company also is not required to show the process by which it reached its conclusion was flawless or that the investigatory methods it employed eliminated possibilities at odds with its conclusions." Id.

Here, in addition to two separate experts who examined the pipe, Allstate assigned two adjusters to investigate the claim, Marianne Lauterwasser and Holly Kelly. Allstate also had a contractor, John Lang of Angel Building & Restoration, Inc., examine the pipe with Ms. Lauterwasser. Mr. Lang testified that he was astonished by the condition of the pipe. Mr. Lang stated: "I've seen split pipes and failure of solder joints and frozen spots and corroded pipes and this was something I had not seen before . . . ." See Allstate's Motion, Ex. E at 16. Mr. Lang therefore advised Allstate to hire a more qualified expert to examine the pipe, advice which Allstate followed.

The undisputed facts show that Allstate did conduct a reasonable investigation before it decided to deny plaintiff's claim.

III.        **CONCLUSION**

For all the above reasons, the court will grant Allstate's Motion For Partial Summary Judgment on Count II of the Complaint. An appropriate order follows.

BY THE COURT:


/s/ Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge